**Barbara Jean BERRY et al., Plaintiffs,**

v.

**SCHOOL DISTRICT OF the CITY OF BENTON HARBOR et al., Defendants.**

**No. CA 9.**

United States District Court, W. D. Michigan, S. D.

June 19, 1980.

---

Thomas I. Atkins, Gen. Counsel, NAACP Sp. Contribution Fund, New York City, Duane A. Elston, NAACP Sp. Contribution Fund, Detroit, Mich., for plaintiffs.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., Stephen C. Small, Small & Small, Benton Harbor, Mich., for Benton Harbor Schools.

E. Michael Stafford, Farhat, Burns & Story, P. C., Lansing, Mich., for Coloma Bd. of Ed.

Francis A. Jones, III, John L. Crow, Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Claire Bd. of Ed.

James E. Riley, Asst. Atty. Gen., Lansing, Mich., for State of Michigan.

Lee Boothby, Boothby, Huff & Yingst, Berrien Springs, Mich., for intervening defendant Zelma Fulner, et al.

Andrew J. Burch, Coloma, Mich., for defendant Baldwin and concerned parents of Hagar Tp.

Thomas J. Nordberg, Thrun, Maatsch & Nordberg, P. C., Lansing, Mich., for Berrien County Intermediate School Dist.

Theodore W. Swift, Thomas A. Baird, Foster, Swift, Collins & Coey, Lansing, Mich., for intervening defendant, Michigan Ed. Ass'n.

Arthur G. Preston, Jr., St. Joseph, Mich., for defendant William S. Sinclair.

## OPINION

DOUGLAS W. HILLMAN, District Judge.

In July, 1978, then Chief Judge Noel P. Fox of this district filed his findings of fact and conclusions of law on the question of liability in Phase II of this case. 467 F.Supp. 630 (W.D.Mich.1978). Before final remedial orders were entered, Judge Fox withdrew for reasons of health and following a blind draw among the other district judges, the case was reassigned to me. Thereafter, the Phase II defendants moved for a new trial, or alternatively, for reconsideration of the nature and scope of the remedy hearing ordered in this case, pursuant to Fed.R.Civ.P. 63.[1] The motion for new trial is now before the court. The court has had the benefit of detailed briefs from all of the parties, as well as lengthy oral argument, and has spent several weeks reviewing the testimony of witnesses and the exhibits offered at trial. Upon due consideration, and for the reasons given below, the court concludes the factual findings of Judge Fox are amply supported by the record, and that, under the terms of Rule 63, it is able to perform its duties in completing the case. Accordingly, defendants' motion for new trial is denied.

### HISTORY

This suit was originally filed by plaintiffs, black schoolchildren and their parents, against the School District of the City of Benton Harbor, Michigan, in 1967, alleging *de jure* segregation of the schools in the Benton Harbor Area School District (BHASD). In 1974 and 1975, Judge Fox permitted plaintiffs to add as defendants William J. Milliken, the Governor of the State of Michigan; Frank J. Kelley, the Attorney General; the State Board of Education (SBE) and John W. Porter, Superintendent of Public Instruction of the State of Michigan; the Berrien County Intermediate School District (BCISD) and its Superintendent; the Eau Claire School District and its Superintendent, Donald McAlvey; and the Coloma Community School District

1. Rule 63 states:
   "*DISABILITY OF A JUDGE*
   If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial."

and its Superintendent, William Barrett. It is these "added defendants" who bring the instant motion.

To simplify trial proceedings, the case was bifurcated. Phase I of the suit concerned the liability of the BHASD Board of Education, which Judge Fox found guilty of *de jure* segregation. 442 F.Supp. 1280 (W.D.Mich.1977). Phase II concerned the liability of the "added defendants". In his lengthy and detailed July, 1978, opinion, *supra*, Judge Fox held that segregation in the BHASD schools was the result of intentional acts and omissions of these defendants. He enjoined them from further acts which would perpetuate segregation in the schools and ordered them to assist in the formulation of a remedy which would eradicate all vestiges of *de jure* segregation in the Benton Harbor Area School District. 467 F.Supp. 630, 692–695. Progress on formulation of a remedy in this suit, now 13 years old, has been slow to date.[2]

## DISCUSSION

■ A motion for new trial under Rule 63 lies entirely in the succeeding judge's discretion. He must have sufficient confidence in the findings and conclusions of his predecessor to be able to conclude the case on a fair and intelligent basis. A court may not properly overrule a decision of the first judge in the absence of special circumstances. 8 Wright & Miller, *Federal Practice and Procedure* § 2922, at 339. Even where such circumstances exist, deference must be paid to the trial judge's findings. *See, Brady v. TWA, Inc.,* 167 F.Supp. 469, 470 (D.Del.1958).

An intervening decision which affects the law of the case has been recognized as a proper ground for a motion for new trial under Rule 63. *Brady, supra.* In support of their motion, defendants in the instant case argue that the law relied upon by Judge Fox has changed since his opinion was filed, and also that his findings of segregative acts and omissions were clearly erroneous and without support of evidence.

### A. The Requirement of Intent.

■ The Court of Appeals for the Sixth Circuit summarized the elements required for a finding of *de jure* segregation in *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182 (1974), *cert. den.* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975):

"A finding of *de jure* segregation requires a showing of three elements: 1) action or inaction by public officials, 2) with a segregative purpose, 3) which actually results in increased or continued segregation in the public schools."

The Supreme Court has made it clear that proof of the second element, racially discriminatory intent or purpose, is necessary and that official action will not be held unconstitutional under the Equal Protection Clause of the Fourteenth Amendment solely because it results in a racially disproportionate impact. *Washington v. Davis,* 426 U.S. 229, 239, 242, 96 S.Ct. 2040, 2047, 2049, 48 L.Ed.2d 597 (1976). The differentiating factor between *de jure* segregation and *de facto* segregation is a purpose or intent to segregate. *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973). This requirement was interpreted in subsequent opinions. Thus, in *Village of Arlington Heights v. Metropolitan Housing Authority,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), the Court stated:

"*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes.

---

**2.** Under Judge Fox the court established a Desegregation Planning Committee (DPC) to formulate a plan that would eliminate segregation within the Benton Harbor Area School. Judge Fox further directed the state and Berrien County defendants to undertake a survey of all school districts within Berrien County to determine whether these school districts have engaged in discriminatory segregative activities and to determine if the effects of any segregative activities have been eradicated. In addition, a three-person panel of experts was appointed by the court to review recommendations of the DPC and submit its independent recommendations to the court. Reports recommending remedy plans have been submitted to the court from the DPC and the court-appointed panel of experts. In addition, the court has directed that a transportation study be completed to assist in the remedy phase.

Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."

And, in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979), the Court stated:

" 'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. . . . It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (Citations and footnotes omitted.)

The courts have uniformly recognized the sensitive and difficult task of ascertaining the intent behind official actions. Judge Fox's careful discussion of this process is set out in Part IV of his Phase I opinion, 442 F.Supp. at 1290–1295, and incorporated by reference in his Phase II opinion, 467 F.Supp. at 632–633. By its very nature, a racially discriminatory purpose for challenged acts or omissions is unlikely to be expressly stated on the record. Discriminatory intent, if it exists, necessarily must be inferred by the court from all of the evidence, direct, indirect, and circumstantial. Examples of the objective evidence which a court may consider are a clear pattern, unexplainable on grounds other than race, which emerges from the effect of state action; the historical background of the decision; the specific sequence of events leading up to the challenged decision; and departures from normal procedures, "particularly if the factors normally considered important by the decision-makers strongly favor a decision contrary to the one reached." (Footnote omitted.) *Arlington Heights, supra*, 429 U.S. at 266–267, 97 S.Ct. at 564–565.

■ Yet another way the court can infer intent is by use of the common law standard of intentional tort liability which makes a person responsible for the natural and probable consequences of acts knowingly done or knowingly omitted. A court may apply this standard in cases brought under 42 U.S.C. § 1983 for alleged violations of civil rights. *See, e. g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Puckett v. Cox*, 456 F.2d 233 (6th Cir. 1972); *Hart v. Community School Board of Education, New York School District No. 21*, 512 F.2d 37 (2nd Cir. 1975); *United States v. School District of Omaha*, 521 F.2d 530 (8th Cir. 1975). As Judge Fox noted in his Phase I liability opinion, 442 F.Supp. at 1293–1294, the Supreme Court acknowledged the relevance of evidence of disproportionate impact for proving intent in *Davis, supra*, 426 U.S. at 242, 96 S.Ct. at 2049:

"Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."

Justice Stevens, concurring, explained:

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decision making, and of mixed motivation." *Id.* at 253, 96 S.Ct. at 2054.

Although it ultimately held there had been no unconstitutional discrimination, the Supreme Court in *Feeney, supra*, 442 U.S. at 279, fn. 25, 99 S.Ct. at 2296, reaffirmed that intent could be inferred from consequences, where reasonably foreseeable:

"This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. Certainly, when the adverse consequences of a law upon an identifiable group are as inevitable as the gender-based consequences of ch. 31, § 23 [the Massachusetts Veterans Preference Statute], a strong

inference that the adverse effects were desired can reasonably be drawn."

To further assist district courts in identifying discriminatory intent, the Sixth Circuit Court of Appeals created an evidentiary tool, the so-called *Oliver* presumption. *Oliver, supra*, at 182. The presumption extended the common law tort standard and shifted the burden of proof to the defendant. After *Oliver*, evidence of the natural, probable and foreseeable results of official actions did not merely permit a court to infer discriminatory intent, but positively gave rise to a presumption of such intent. The Court of Appeals added:

"The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies." *Ibid.*

The *Oliver* presumption was the rule in this circuit when Judge Fox tried Phase II of the case. It is cited by him, by reference to the applicable legal standards in the Phase I opinion, and some of the language of the Phase II opinion indicates a shifting of the burden of coming forward with evidence, such as would occur when the presumption is employed. It is clear that Judge Fox gave close attention to the natural, probable, and foreseeable results of the acts and omissions of the Phase II defendants. He relied, at least in part, on the *Oliver* presumption in finding discriminatory intent underlying defendants' conduct. It is the Judge's use of the presumption that forms the basis of defendants' motion.

*B. Intervening Decisions.*

Defendants move for a new trial on the ground that the *Oliver* presumption has been rejected by the Supreme Court in two intervening decisions. Although defendants in *Oliver* had petitioned the Supreme Court for a writ of certiorari, it was denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449, and the Court never directly ruled on the presumption. However, last summer, in two school desegregation cases from the Sixth Circuit, the Supreme Court cast doubt on its continued viability. In *Dayton Board*

of Education v. Brinkman, 443 U.S. 526, 525 fn. 9, 99 S.Ct. 2971, 2978, 61 L.Ed.2d 720 (1979), (*Dayton II*), the Court wrote:

"We have never held that as a general proposition the foreseeability of segregated consequences makes out a prima facie case of purposeful racial discrimination and shifts the burden of producing evidence to the defendants if they are to escape judgment; and even more clearly there is no warrant in our cases for holding that such foreseeability routinely shifts the burden of persuasion to the defendants."

In *Columbus Board of Education v. Penick*, 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979), the Supreme Court affirmed the District Court's use of the controlling cases,[3] stating:

"The district court also recognized that under those cases disparate impact and foreseeable consequences, without more, do not establish a constitutional violation." *Ibid.*

These statements by the Court indicate that after *Columbus* and *Dayton II* a trial court may not apply a presumption to establish discriminatory intent by officials. The issue now before the court is whether the apparent rejection of the *Oliver* presumption invalidates Judge Fox's findings of fact and conclusions of law so that it should exercise its discretion under Rule 63 to grant a new trial. Because Judge Fox did not base his findings wholly on a now invalid rule of law, but made permissible inferences from the total circumstances and because I find the evidence of the circumstances to be sufficient to support such inferences, I conclude that a new trial is not warranted.

*C. Inferences from Foreseeable Results.*

■ Although it is argued the *Oliver* presumption is now dead, in fact the Supreme Court reaffirmed the use of inferences drawn from proof of foreseeable consequences in both *Columbus* and *Dayton II*. After rejecting the presumption in *Dayton II, supra*, at 536, fn. 9, 99 S.Ct. at 2978, Justice White concluded:

---

**3.** *Keyes, supra; Davis, supra; Arlington Heights, supra.*

"[P]roof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose . . ."

The *Columbus* opinion expressly affirmed the factual findings and conclusions of the trial court, including inferences from the impact of official actions. It also affirmed the lower court's application of the law. The Court rejected the petitioner school board's argument that drawing inferences from disparate impact was "nothing more than equating impact with intent, contrary to the controlling precedent." *Id.*, at 464, 99 S.Ct. at 2950. Citing the district court's opinion, 429 F.Supp. 229 (S.D.Ohio 1977), Justice Stewart wrote:

"[T]he District Court correctly noted that actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose. Those cases [i. e., *Davis; Arlington Heights*] do not forbid 'the foreseeable effects standard from being utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn.' *Id.*, at 255. Adherence to a particular policy or practice, 'with full knowledge of predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.' *Ibid.*" *Id.*, at 464–465, 99 S.Ct. 2950.

In its opinion, the district court had concluded, 429 F.Supp. at 240:

"Based upon the law . . . I am constrained from certain facts which I believe to be proved, to draw the inference of segregative intent from the Columbus defendants' failures, after notice to consider predictable racial consequences of their acts and omissions when alternatives were available which would have eliminated or lessened racial imbalance." (Footnote omitted.)

Defendants are correct in asserting the law has changed as a result of the *Columbus* and *Dayton II* opinions. What changed was the process of reasoning through which the trial court reached its findings, not the kind of evidence which may be considered by the court nor its relevance to a finding of discriminatory intent. The Supreme Court rejected the presumption, but clearly retained the standard which permits a court to infer intent from the total circumstances, including evidence of foreseeable consequences.

Although Judge Fox made use of the presumption to reach his findings, he considered the same basic evidence that would be weighed by a court operating without the presumption. As documented throughout his opinion, he considered the disparate impact of official action and inaction, and its foreseeability. He considered defendants' notice of predictable racial consequences and their resulting action or inaction, in the face of less offensive alternatives. He considered the social, political, and historical circumstances of Berrien County, which surrounded and led up to official actions. He considered departures from normal standards, and the absence, in some cases, of convincing neutral reasons for the actions taken.

All of this evidence, voluminous and exhaustive in detail, is relevant to prove forbidden purpose. After a careful review of the facts relied upon and cited by Judge Fox in his Phase II opinion, I conclude that the evidence in the record is sufficient to permit an inference of unlawful, racially discriminatory intent by each of the defendants, without recourse to a presumption. For this reason, I hold that Judge Fox's findings and conclusions are factually and legally sufficient and form the basis for a remedy in this case.

Defendants' motion for a new trial is denied.

These defendants in addition to the request for new trial seek an expanded hearing on the nature and scope of the remedy. On Monday, August 4, 1980, the court will begin a hearing on issues relating to formulation and implementation of a remedy. I have concluded that in order to assist me in effectively performing the duties that are

mine as a trial judge in both the formulation and implementation of a remedy in this case, I request the parties to address and introduce proofs on issues relating to the scope and nature of an appropriate remedy.

The drafting and implementation of a remedy necessarily involves sensitive issues of great concern to all the communities involved. Many deep-felt and competing values exist in a case such as this to which the court will continue to give careful and thoughtful attention. It is the hope and expectation of the court that the parties and the attorneys as well as interested citizens will actively cooperate in order to create a fair, just and realistic remedy the community will accept and which will also be successful in providing quality education to all the children in conformance with the mandates of the U. S. Constitution.

IT IS SO ORDERED.